**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

8

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

SAN JOSE DIVISION

10

11

Norman P. Evers,                                          NO. C 03-04805 JW

12

        Petitioner,                           **ORDER DENYING PETITION FOR WRIT
OF HABEAS CORPUS**

13

  v.

Silvia Garcia, Warden,

14

       Respondent.

15

_____/

16

17

**<ins>INTRODUCTION</ins>**

18

     This matter is now before the Court for consideration of Norman Philip Evers' ("Petitioner")

19

petition for writ of habeas corpus under 28 U.S.C. § 2254 concerning his April 2000 conviction in

20

Humboldt County Superior Court.  For the reasons discussed below, the petition is DENIED as to all

21

claims.

22

**<ins>BACKGROUND</ins>**

23

**I.      <ins>Case History</ins>**

24

     On April 6, 2000, a jury found Petitioner guilty of first-degree murder pursuant to Penal Code §

25

187, and guilty of personally discharging a firearm in the commission of that offense pursuant to Penal Code

26

§ 12022.53(d).  Petitioner was sentenced to 25 years to life in prison for the murder count, and a

27

consecutive term of 25 years to life on the sentencing enhancement.  Petitioner filed an appeal, which was

28

denied by the California Court of Appeal on August 24, 2001.  The California Supreme Court denied his

1   petition for review on November 14, 2001.  Petitioner then filed a writ of habeas corpus with the state trial

2   court, which was denied on November 22, 2002.  Petitioner then filed a petition for writ of habeas corpus,

3   which was denied by the California Court of Appeal on December 19, 2002.  Petitioner filed a petition for

4   writ of habeas corpus with the California Supreme Court, which was denied on September 10, 2003.

5          Petitioner filed a motion with the state trial court for DNA testing on two cigarette butts found at the

6   crime scene, which was denied by the state trial court on May 15, 2003.  Petitioner filed a petition for writ

7   of mandate/prohibition, seeking reversal of the trial court's denial of his request for DNA testing, which was

8   denied by the California Court of Appeal on May 29, 2003.  Petitioner then filed a petition for review in the

9   California Supreme Court, which was denied on July 30, 2003.

10  Petitioner filed the instant petition for a writ of habeas corpus with this Court on October 27, 2003. On

11  May 5, 2004, this Court issued an Order to Show Cause to Respondent as to why the petition should not

12  be granted; and, after ten extensions, Respondent addressed the merits of the petition in a timely response.

13  Petitioner then filed a traverse in April 2005.

14         Petitioner raised five challenges to his conviction by asserting the following claims: (1) the trial court

15  erred in its failure to instruct the jury on third-party culpability and Petitioner's alibi defense under CALJIC

16  No. 4.50 in violation of Petitioner's Due Process right to a fair trial; (2) the trial court erred in instructing the

17  jury in terms of "Guilt" and "Innocence" under CALJIC No. 2.01, by giving CALJIC No. 2.70 without

18  clarification, in violation of Petitioner's Due Process right to a fair trial; (3) ineffective assistance of counsel

19  due to trial counsel's failure to request the above jury instructions on third-party culpability, alibi defense,

20  and "Guilt" and "Innocence" terms, and due to trial counsel's failure to object to the Prosecutor's comment

21  on Petitioner's silence; (4) the Prosecutor's comment on Petitioner's post-arrest silence violated

22  Petitioner's rights to due process and to remain silent; (5) Petitioner is entitled to have DNA testing

23  performed on the only physical evidence connecting him to the murder scene and the failure to perform

24  DNA testing violated Petitioner's right to due process.

25  **II.     Facts**

26         At approximately 8:40 a.m. on September 19, 1999, Katherine Barnes-Roberts discovered the

27  body of June Lawson ("Ms. Lawson") in the Holbrook Grove area north of Redway, California, in

28

**United States District Court**
For the Northern District of California

2

United States District Court

For the Northern District of California

Humboldt County.  Ms. Lawson was lying face down in a grassy area adjacent to the parking lot of the grove.  She suffered two gunshot wounds to the head and there was evidence that a third bullet had been shot at her neck but had missed.  Ms. Lawson also suffered blunt force trauma to the face and head.  Ms. Lawson was 19 years old at the time of her death.

On the Friday before Ms. Lawson's murder, September 17, 1999, Petitioner visited Tara Kent at her parent's home in Redway.  Ms. Kent had known Petitioner for about six months and considered him a friend.  Petitioner asked her if she had seen Ms. Lawson.  Ms. Kent told him that she had not seen Ms. Lawson and asked him why he was looking for her.  Petitioner said that Ms. Lawson stole $40 from him and that he was going to "beat the shit out of her."  He said that he was going to beat her up so no one would recognize her and that he planned to shoot her in the head with a .22 gun.  According to Ms. Kent, Petitioner said that he was going to shoot Ms. Lawson under the chin, behind the ear and in the back of the head, that .22 bullets were small, that they would rattle around inside her head and turn her brains to mush.  Ms. Kent did not take Petitioner seriously.

Ms. Kent did not tell Ms. Lawson about Petitioner's threats but told her friend Joanna.  Joanna in turn told Ms. Lawson.  Ms. Lawson, however, also did not take Petitioner's threat seriously.

Petitioner told co-workers at Calico's about his intent to kill Ms. Lawson.  He told Rudy Leon ("Leon") that he wanted to kill Ms. Lawson and dump her off in some grove.  Petitioner told Leon that Ms. Lawson had stolen some methamphetamine from him.  Leon had smoked some marijuana prior to having the conversation with Petitioner.  He did not think Petitioner was serious about the threat.  Leon also recalled overhearing Petitioner tell Jerred Hernandez ("Hernandez"), a co-worker and Leon's roommate, that he was going to hurt Ms. Lawson.

Hernandez also testified that Petitioner told him that he planned to kill Ms. Lawson because she had stolen a "J" from him.[1]  Petitioner invited Hernandez to go along with him.  Hernandez said that he would think about it.  Hernandez did not think Petitioner was serious.

At about 10:00 p.m. on Saturday, September 18, 1999, Hernandez was at his apartment when Ms. Lawson and Rosemary Brown ("Brown") stopped by.  They smoked a marijuana joint together.  About 15 minutes later, Petitioner came over to the apartment.  Ms. Lawson, Brown and Petitioner left the

---

[1] J is another term for methamphetamine.

**United States District Court**
For the Northern District of California

1   apartment about 10:30 or 11:00 p.m.  Hernandez's girlfriend, Brandi Golliher, came over to the apartment

2   around 12:00 a.m. and stayed the night.

3         Hernandez saw Petitioner at Calico's on Sunday afternoon at approximately 4:00 p.m.  Petitioner

4   told him that he had killed Ms. Lawson.   He said that he drove Ms. Lawson out to the woods, that he got

5   out of his pickup truck and pretended to be tying his shoe or looking at something on the ground and asked

6   Ms. Lawson to come look.  When she knelt down, he shot her three times in the head.  Petitioner told

7   Hernandez that he used a .22 caliber gun.  He also told Hernandez that he had gotten Ms. Lawson alone by

8   telling Forrest Clark to take Brown away so that he could be alone with Ms. Lawson.  He also told

9   Hernandez that he thought Ms. Lawson was found quickly and that a bear must have dragged her body out

10  from where he left her.

11        Later that night, Petitioner came over to Hernandez's apartment to pick up Leon to take him to

12  work.  Leon volunteered at a local radio station as a disc jockey, working from 11:00 p.m. to 5:00 a.m.

13  Hernandez rode with Petitioner and Leon.  He then accompanied Petitioner to his home. They played video

14  games and Petitioner tried to convince Hernandez not to tell anyone about what he did to Ms. Lawson.

15  Petitioner gave Hernandez an old television set.  Hernandez felt odd about the gift.  Before they left

16  Petitioner's home, Petitioner told Hernandez that the .22 caliber gun was under the trailer.

17        On Monday, September 20, 1999, Hernandez told Leon and Paul Donaldson ("Donaldson"), a

18  cook at Calico's, that Petitioner killed Ms. Lawson.  Donaldson told Hernandez not to mention to the

19  police that Petitioner killed Ms. Lawson because of the alleged stolen drugs; Donaldson was at the motel

20  room when the alleged theft occurred.

21        On Monday evening, September 20, 1999, Hernandez called the police about the murder.  He

22  tried to remain anonymous but the police encouraged him to agree to an interview.  Hernandez agreed to

23  meet the police behind Calico's at midnight.  When the police arrived, Hernandez got into the car and laid

24  down in the backseat to avoid being noticed.  Hernandez told the police that Petitioner killed Ms. Lawson

25  but omitted the fact that he had done so because she had stolen drugs from him.  He also omitted that

26  Petitioner had previously threatened Ms. Lawson and that Petitioner had invited him to come along to kill

27  Ms. Lawson.  After a break, however, Hernandez told the police these facts because he wanted to tell the

28  truth.

4

**United States District Court**
For the Northern District of California

1       Brown, a 13-year old friend of Ms. Lawson, testified that she was with Ms. Lawson the evening of

2   September 18, 1999.  They went to Hernandez's apartment and stayed for less than a half hour.  Petitioner

3   was at the apartment and they left with him in his pickup truck.  The truck was dirty the way it usually was.

4   They eventually went to a friend's apartment where Petitioner got Forrest Clark to come out to tell Brown

5   to get out of the truck because he wanted to talk to her.  Petitioner got in the truck and started to drive off

6   with Ms. Lawson.  Brown asked, "Where are you going?"  Ms. Lawson responded, "I'll be back in a

7   minute."  Brown never saw Ms. Lawson again.  The next day, she saw Petitioner's truck and noticed that it

8   was clean.

9       William Porter, an evidence technician for the Humboldt County Sheriff's Department, testified that

10   he examined the scene where Ms. Lawson's body was found and found a cigarette lighter, two fresh

11   cigarette butts, one of which was a Camel, fifteen .22 cartridge casings and a .22 caliber bullet.  In a search

12   of Petitioner' truck, he found a box of Camel cigarettes.

13       Toby Baxter, a criminalist, testified that he examined the crime scene and determined that Ms.

14   Lawson's body was dragged to the location where she was found.

15       Detective Thiel ("Thiel") was one of two officers assigned to investigate the murder.  On September

16   22, 1999, he served a search warrant on Petitioner's trailer, a mobile home.  He found .22 ammunition and

17   several guns but did not locate a .22 caliber gun.  Thiel also conducted a search of the crawl space

18   underneath the trailer.  He checked the area thoroughly, including the "I-beams," but did not locate a gun.

19   Petitioner was arrested later that afternoon.

20       On October 14, 1999, Petitioner's wife cleaned under the trailer with Kathleen Gusky-Sharp, a

21   co-worker.  Petitioner's wife directed Gusky-Sharp to look up for something under the trailer.

22   Gusky-Sharp found a .22 caliber gun on an I-beam.  Petitioner's wife took the .22 caliber gun to the

23   sheriff's office.

24       Thiel subsequently checked the area where the gun was found.  Thiel had previously searched that

25   same area on September 22, 1999, and had not found a gun.

26       John Boyd, a criminalist, testified that he examined the .22 caliber gun and that the bullet recovered

27   from Ms. Lawson's body was fired from it.  Mr. Boyd also found that the bullet recovered at the scene

28   was fired from the same gun.

Petitioner, who was 34 years old at the time of the murder, testified that on September 18, 1999, he arranged to loan his truck to Hernandez. Hernandez wanted to have sex with Ms. Lawson and did not want Golliher, his girlfriend, to find out about it. He drove Ms. Lawson and Brown to Forrest Clark's home and Clark agreed to help him "ditch" Brown. Petitioner then went to Hernandez's apartment and picked him up. They proceeded to Redway to buy some methamphetamine and cigarettes. They got cigarettes and then Petitioner drove them to his house. By prearrangement, Petitioner got out of his truck, and Hernandez drove off with Ms. Lawson. Petitioner stayed at home but did not wake up his wife. Hernandez returned about a half-hour later. Petitioner sneaked out of his home to drive Hernandez home. He told Petitioner that he beat up Ms. Lawson and left her in the woods and asked Petitioner to tell anyone who asked that Petitioner dropped off Ms. Lawson in town. Hernandez said that he was paying Ms. Lawson back because she had beaten him.

Petitioner admitted that the gun found under his trailer belonged to him. He testified that he sold the gun to Hernandez for $150 on September 12, 1999. Hernandez made only a partial payment of $50. Petitioner learned of the murder on Monday, September 20, 1999, at about 5:00 or 6:00 p.m.; he also heard that he was being implicated. He therefore drove to the sheriff's station and made a report to Deputy Jones. Petitioner did not tell Jones about seeing Hernandez on Saturday evening, that Hernandez admitted beating up Ms. Lawson or that he sold Hernandez a gun. He was not honest with Jones because he is "not a snitch" and does not "narc on people." Petitioner denied that he ever threatened Ms. Lawson and he denied killing her. He admitted that he was involved in the sale and use of methamphetamine.

Peter Connolly, Hernandez's boss, testified that he overheard Hernandez say that he was beaten up and that Ms. Lawson was responsible.

Richard Muha, the defense investigator, testified that he interviewed Connolly prior to the trial. Connolly said that Hernandez told him that he had been beaten up a couple of times and that Ms. Lawson was responsible.

Hernandez was recalled as a witness and denied that he had been beaten up by Ms. Lawson or at her direction.

In rebuttal, Brandi Golliher, Hernandez's ex-girlfriend, testified that she saw Ms. Lawson get into Petitioner's truck a little before 1:00 a.m. on Saturday evening in front of Forrest Clark's apartment

complex.  Only Petitioner and Ms. Lawson were in the truck.  Within minutes, Golliher went to

Hernandez's apartment and he was there.  She stayed with Hernandez in his bedroom until the next

morning.

**DISCUSSION**

**I.      Standard of Review**

Petitioner filed his petition for writ of habeas corpus in this Court on August 8, 2003, and filed his

amended petition for habeas corpus on May 21, 2004.  Accordingly, this case is governed by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which imposes a "new constraint on

the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus."

Williams v. Taylor, 529 U.S. 362, 412 (2000).  Under the AEDPA, a district court may entertain a petition

for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on

the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the merits in

state court proceedings unless the adjudication: "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

Untied States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers

to "the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant

state court decision."  Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000); Lockyer v. Andrade, 538

U.S. 63, 71 (2003); Alvarado v. Hill, 252 F.3d 1066, 1068-9 (9th Cir. 2001).  Section 2254(1) "restricts

the source of clearly established law to the [Supreme] Court's jurisprudence."  Williams, 529 U.S. at 412.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives

at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court

decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts."  Id. at

412-13.  "Under the 'reasonable application' clause, a federal habeas court may grant the writ if the state

court identifies the correct governing legal principle form [the] Court's decisions but unreasonably applies

that principle to the facts of the prisoner's case."  Id. at 412-13.

7

1    "[A] federal habeas court may not issue the writ simply because the court concludes in its

2    independent judgment that the relevant state court decision applied clearly established federal law

3    erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  The

4    objectively unreasonable standard is not a clear error standard.  See Andrade, 538, U.S. at 63 (rejecting

5    the Ninth Circuit's use of clear error standard in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)).

6    After Andrade, "[t]he writ may not issue simply because, in our determination, a [s]tate court's application

7    of federal law was erroneous, clearly or otherwise."  Id. at 75-76.  While the 'objectively unreasonable'

8    standard is not self-explanatory, at a minimum "it denotes a greater degree of deference to the state courts

9    than the [Ninth Circuit] ha[s] previously afforded them."  Id. at 75.

10    A federal habeas court may also grant the writ if it concludes that the state court's adjudication of

11    the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the

12    evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable

13    determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant

14    evidence, central to petitioner's claim, that was properly presented and made part of the state-court record.

15    Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any

16    determination of a factual issue made by a state court unless the petitioner rebuts the presumption of

17    correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This presumption is not altered by

18    the fact that the finding was made by a state court of appeals, rather than by a state trial court.  See Sumner

19    v. Mata, 449 U.S. 539, 546-47 (1981); see also Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001),

20    amended by 253 F.3d 1150 (9th Cir. 2001).  Where, as here, the California Supreme Court denies review

21    of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in

22    conducting habeas review.  See Shackleford v. Hubbard, 234 F.3d 1072, 1079 (9th Cir. 2000) (citation

23    omitted), cert. denied, 354 U.S. 944 (2001) (the district court "looks through" the unexplained California

24    Supreme Court decision to the last reasoned state court decision).  In the instant case, the California Court

25    of Appeal rendered the last reasoned state court decision.

26    Habeas relief is warranted only if the constitutional error at issue is structural error or had a

27    "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S.

28    782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  Under this standard,

United States District Court
For the Northern District of California

1    habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to

2    habeas relief based on trial error unless they can establish that it resulted in "actual" prejudice. <u>Brecht</u>, 507

3    U.S. at 637.

4    **II.    <u>Legal Claims</u>**

5

6    **a.    <u>The Petitioner's Due Process rights were not violated when the<br>trial court failed to instruct the jury sua sponte on third-party culpability.</u>**

7    **i.    <u>Background</u>**

8    Petitioner contends that he was denied his Due Process right to a fair trial when the trial court failed

9    to instruct the jury sua sponte regarding third-party culpability.  Petitioner argues that the suspicious

10   discovery of the murder weapon under his trailer strongly suggests that the real murderer remains free.

11   Petitioner further claims that newly discovered evidence uncovered after his conviction and presented in his

12   state habeas petitions, strongly suggests that Hernandez, whom he alleges is a serial killer, was responsible

13   for the murder of Ms. Lawson.

14   **ii.    <u>Applicable Federal Law</u>**

15   A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a

16   federal habeas corpus proceedings.  <u>See</u> <u>Dunckhurst v. Deeds</u>, 859 F.2d 110, 114 (9th Cir. 1988).  The

17   error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth

18   Amendment.  <u>See id</u>.  Whether a constitutional violation has occurred will depend upon the evidence in the

19   case and the overall instructions given to the jury.  <u>See</u> <u>Duckett v. Godinez</u>, 67 F.3d 734, 745 (9th Cir.

20   1995).  After all, due process does not require that an instruction be given unless the evidence supports it.

21   <u>See</u> <u>Hopper v. Evans</u>, 456 U.S. 605, 611 (1982); <u>Miller v. Stagner</u>, 757 F.2d 988, 993 (9th Cir.),

22   <u>amended</u>, 768 F.2d 1090 (9th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1048 (1986).

23   An examination of the record is required to see precisely what was given and what was refused and

24   whether the given instructions adequately embodied the defendant's theory.  <u>See</u> <u>United States v.

25   Tsinnijinnie</u>, 601 F.2d 1035, 1040 (9th Cir. 1979), <u>cert. denied</u>, 445 U.S. 966 (1980).  The omission of an

26   instruction is less likely to be prejudicial than a misstatement of the law.  <u>See</u> <u>Walker v. Endell</u>, 850 F.2d at

27   475-76 (<u>citing</u> <u>Henderson v. Kibbe</u>, 431 U.S. at 155).  Thus, a habeas petitioner whose claim involves a

28   failure to give a particular instruction bears an "'especially heavy burden.'"  <u>Villafuerte v. Stewart</u>, 111 F.3d

*(left margin, vertical text)* **United States District Court**  For the Northern District of California

United States District Court

For the Northern District of California

616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. at 145, 155 (1977)).  The significance of

the omission of such an instruction may be evaluated by comparison with the instructions that were given.

Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (quoting Henderson, 431 U.S. at 156); see

id. at 972 (due process violation found in capital case where petitioner demonstrated that application of the

wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its

discretion to impose life or death sentence).

It is well established that a criminal defendant is entitled to adequate instructions on the defense

theory of the case.  See Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's

request for instruction on simple kidnapping where such instruction was supported by the evidence).

However, the defendant is not entitled to have jury instructions raised in his or her precise terms where the

given instructions adequately embody the defense theory.  See United States v. Del Munro, 87 F.3d 1078,

1081 (9th Cir. 1996); Tsinnijinnie, 601 F.2d at 1040.

### iii.   **Analysis**

The Due Process Clause "protects the accused against conviction except upon proof beyond a

reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship,

397 U.S. 358, 364 (1970).  The "beyond a reasonable doubt" standard is a requirement of due process,

but the Constitution neither prohibits the trial courts from defining reasonable doubt nor requires them to do

so as a matter of course.  See Victor v. Nebraska, 511 U.S. 1, 6 (1994).  So long as the trial court

instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, the

Constitution does not require that any particular form of words be used in advising the jury of the

government's burden of proof.  See id.  Rather, taken as a whole, the instructions must correctly convey

the concept of reasonable doubt to the jury.  See id. (citing Holland v. United States, 348 U.S. 121, 140

(1954)).  The proper inquiry is "whether there is a reasonable likelihood that the jury understood the

instructions to allow conviction on proof sufficient to meet the Winship standard."  Id. at 16.

On the tenth day of trial, the Prosecutor filed a motion in limine to exclude third-party culpability as

a jury instruction.  (See Ex. B, RT 634.)  When the trial court asked Petitioner's counsel whether there was

any direct or circumstantial evidence linking Hernandez to Ms. Lawson's death, Petitioner's counsel stated,

"Not - - not aside from the motive and the opportunity that I can articulate at this time."  (See Ex. B, RT

634.)  The trial court then granted the motion to exclude third-party culpability, though the court allowed for the possibility of revisiting the issue should Petitioner provide evidence linking Hernandez to the crime.  (Ex. B, RT 636-37.)  Petitioner was unable to do so and no third-party culpability instruction was offered to the jury.

However, the trial court did present CALJIC No. 2.90 to the jury.  California's reasonable doubt instruction, CALJIC No. 2.90, has been found constitutionally fit.  Its use of the terms "moral evidence" and "moral certainty," although troublesome, does not improperly dilute the requirement of proof beyond a reasonable doubt.  See id. at 7-17 (not reasonably likely that moral certainty in CALJIC No. 2.90 suggests a standard of proof lower than due process requires).  CALJIC No. 2.90 was revised after Victor to delete all references to "moral certainty" and "moral evidence."  The post-Victor version of CALJIC No. 2.90 was upheld in Lisenbee v. Henry, 166 F.3d 997-1000 (9th Cir. 1999) (use of term "abiding conviction" in defining reasonable doubt is constitutionally sound.)

Petitioner was unable to present evidence linking a third-party to the murder of Ms. Lawson, so no third-party culpability instruction was offered.  Instead, the trial court provided California's reasonable doubt instruction, which has been found constitutional.  Upon review of the instructions provided by the trial court, this Court finds that Petitioner fails to show a reasonable likelihood that the jury did not understand the instructions, or to show an error that so infected the trial that he was deprived of the fair trial guaranteed him by the Fourteenth Amendment.

Accordingly, Petitioner has failed to establish that he is entitled to habeas relief on the basis that the trial court's failure to instruct the jury on third-party culpability violated his Due Process rights.

**b.** **The trial court had no duty to give alibi jury instruction sua sponte.**

**i.** **Background**

Petitioner alleges that the trial court's failure to sua sponte provide an alibi instruction to the jury was per se reversible error.  Petitioner alleges that alibi was a primary defense and that any failure to provide an alibi instruction was a violation of his Due Process rights.

**ii.** **Applicable Federal Law**

A defendant is entitled to an instruction concerning his theory of the case it if is supported by law and some foundation in the evidence.  See United States v. Mason, 902 F.2d 1434, 1438 (9th Cir. 1990).

**United States District Court**
For the Northern District of California

1    The Ninth Circuit has held that even if the alibi evidence is "weak, insufficient, inconsistent, or of doubtful

2    credibility," the instruction should be given.  United States v. Zuniga, 6 F.3d 569, 570 (9th Cir. 1993)

3    (citing United States v. Washington, 819 F.2d 221, 225 (9th Cir. 1987)).  An alibi instruction is critical

4    because a juror, unschooled in the law's intricacies, may interpret a failure to prove the alibi defense as

5    proof of the defendant's guilt.  See Zuniga, 6 F.3d at 570.  To avoid this possibility, where alibi is the

6    defense, a suitable instruction must be given when requested.  See id. (citing United States v. Hoke, 610

7    F.2d 678, 679 (9th Cir. 1980)).

8                        **iii.      Analysis**

9          Petitioner argues that the trial court should have offered, sua sponte, a jury instruction on alibi

10   defense, or, more specifically, CALJIC No. 4.50.  Petitioner argues that his Due Process right to a fair trial

11   was violated by the trial court's failure to provide this instruction to the jury.

12   "No case, however, requires the trial court to give a sua sponte instruction on alibi; on the contrary, our

13   precedent establishes that failure to give an alibi instruction is not error if the defendant did not request such

14   an instruction."  See United States v. Loya, 807 F.2d 1483, 1493-94 (9th Cir. 1987) (holding that the

15   district court's instruction that the jury need not find the crimes were committed on a certain date did not

16   affect the fundamental fairness of the trial, despite defendants' evidence of alibi, where defendants did not

17   request an alibi instruction); Lewis v. United States, 373 F.2d 576, 579 (9th Cir. 1967) ("The last error

18   alleged is that no instruction on alibi was given.  The short answer is that none was offered and none

19   requested. . . . An exception exists in certain cases where the court, of its own volition, must deliver certain

20   instructions; but this is not such a case."); Holm v. United States, 325 F.2d 44, 45 (9th Cir. 1963) ("[The

21   defendant] now complains that the trial court failed to give an instruction on the defense of alibi and thus

22   committed reversible error.  The answer to that assignment of error is that appellant failed to ask the court

23   to give such an instruction and hence his objection at this time is without merit.")  United States v. Lillard,

24   345 F.3d 850, 855-56 (9th Cir. 2003).

25        In light of precedent, supra, if Petitioner does not request an alibi instruction, as was the case here,

26   the trial court has no sua sponte duty to instruct the jury regarding such an instruction.

27   Accordingly, Petitioner has failed to establish that he is entitled to habeas relief on the basis of this claim.

28

**United States District Court**
For the Northern District of California

**c.**   **Petitioner's Due Process rights were not violated by the trial court's jury instruction of guilt and "innocence" under CALJIC No. 2.01, or by the trial court's failure to provide a pinpoint jury instruction sua sponte in place of CALJIC No. 2.70**.

   **i.**   **Background**

Petitioner alleges that the trial court violated his Due Process right to a fair trial by instructing the jury in terms of guilt and "innocence" under CALJIC No. 2.01,[2] and by giving CALJIC No. 2.70[3] without clarification.  Petitioner argues that the trial court should have acted sua sponte and presented a pinpoint instruction highlighting his theory that any alleged confession to his co-workers should not be believed, rather than the standard jury instruction that was offered to the jury.

   **ii.**   **Applicable Federal Law**

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle v. McGuire, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir.), cert. denied, 488 U.S. 861 (1988); see e.g., Middleton v. McNeil, 124 S. Ct. 1830, 1831-32 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law); Mayfield v. Woodford, 270 F.3d 915, 922-24 (9th Cir. 2001) (no error where court allowed the jury to consider "such guilt phase instructions as it found applicable" for the penalty phase (raising concerns that they would rely on instructions precluding consideration of

_____

[2] CALJIC No. 2.01 sets forth the principles of the law pertaining to circumstantial evidence.

[3] CALJIC No. 2.70 sets forth the principles of the law pertaining to confessions.

13

1   mitigating factors) because when viewed as a whole the instructions required the jurors to consider all

2   relevant mitigating evidence of the penalty phase).

3            **iii.    <u>Analysis</u>**

4            Petitioner argues that "the trial court has a duty under principles of federal due process principles to

5   give the jury instructions that are clear enough to focus them on the issues that they must face and decide."

6   (Petitioner's Traverse at 11-12.)  Under this argument he claims that CALJIC No. 2.01, Sufficiency of

7   Circumstantial Evidence – Generally, shifts the burden to him to prove his innocence, while CALJIC No.

8   2.70, presented an improper or incomplete instruction upon the evaluation of witness credibility, lessening

9   the Prosecutor's burden and implicating Petitioner's federal constitutional right to a fair trial and due

10  process of law.[4]  (Ex. A, 0162; Ex. A, 0173.)

11           However, as noted <u>supra</u>, the trial court did present to the jury, among other instructions,

12  California's reasonable doubt instruction. CALJIC No. 2.90 provides:

13                   A defendant in a criminal action is presumed to be innocent until the
                     contrary is proved, and in case of a reasonable doubt whether [his] guilt
14                   is satisfactorily shown, [he] is entitled to a verdict of not guilty.  This
                     presumption places upon the People the burden of proving [him] guilty
15                   beyond a reasonable doubt.

16                   Reasonable doubt is defined as follows: It is not a mere possible doubt;
                     because everything relating to human affairs is open to some possible or
17                   imaginary doubt.  It is that state of the case which, after the entire
                     comparison and consideration of all the evidence, leaves the minds of the
18                   jurors in that condition that they cannot say they feel an abiding conviction
                     of the truth of the charge.
19
20  (Ex. A, 0175.)

21           Upon review of the record and an evaluation of the jury instructions in the context of the overall

22  charge to the jury as a component of the entire process, the Court finds that any ailing instruction by itself

23  did not so infect the entire trial such that the resulting conviction violated due process.

24           Therefore, Petitioner has failed to establish that he is entitled to habeas relief on the basis of this

25  claim.

26           **d.    <u>Petitioner's Due Process rights were not violated when the California appellate
                 court denied his request to test DNA on cigarette butts found at the scene of the
27               crime</u>.**

28           [4] Petitioner requested CALJIC Nos. 2.01 and 2.07. (See Ex. A, 0131-2.)

### i.     Background

Petitioner contends that DNA testing of the cigarette butts found at the scene of the crime could reveal that the only physical evidence at the scene does not connect Petitioner to the crime.  He argues that if he had been able to prove by DNA analysis that the cigarettes found at the scene were not smoked by him; then, by clear and convincing evidence, he has established that, but for the lack of DNA analysis, no reasonable factfinder would have found him guilty.

### ii.     Applicable Federal Law

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  Herrera v. Collins, 506 U.S. 390, 400 (1993).  Herrera makes it clear that there can be no habeas relief based solely on petitioner's actual innocence of the crime.  See Coley v. Gonzalez, 55 F.3d 1385, 1387 (9th Cir. 1995); Swan v. Peterson, 6 F.3d 1373, 1384 (9th Cir. 1993), cert. denied. 513 U.S. 985 (1994).

Title 28 U.S.C. § 2254(d)(2) applies to intrinsic review of a state court's process, or situations in which the petitioner challenges the state court's findings based entirely on the state court record, whereas section 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor, 366 F.3d at 999-1000.  In Taylor, the Ninth Circuit established a two-part analysis under section 2254(d)(2) and (e)(1).  First, federal courts must undertake an "intrinsic review" of the state court's factfinding process under the "unreasonable determination" clause of section 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine the state court's factfinding process, not its findings.  "Once the state court's factfinding process survives this intrinsic review – or in those cases where [the] petitioner does not raise an intrinsic challenge to the facts as found by the state court – the state court's findings are dressed in a presumption of correctness . . . ."  Id.  The relevant question under section 2254(d)(2) is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the state court findings are supported by the record.  Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004.)

//

**United States District Court**
For the Northern District of California

iii.   **Analysis**

Petitioner challenges the state court's findings based on the state court record, therefore this Court will conduct its analysis under 28 U.S.C. § 2254(d)(2) and undertake an "intrinsic" review of the state court's process.  After a careful review of the record and relevant cases, the Court is satisfied that the appellate court's conclusion was not objectively unreasonable when it determined that the "new evidence raised in the concurrent petition for writ of habeas corpus does not cast a serious doubt as to the reliability of defendant's murder conviction."  (Ex. A, Order on Motion For Performance of DNA Testing at 2.)

Pursuant to Penal Code § 1405(d)(5), Petitioner made a motion for Performance of DNA Testing of two cigarette butts found at the murder scene.  The California appellate court reviewed the record and determined:

> "(a) [Petitioner] has failed to: 'Explain, in light of all the evidence, how the requested DNA testing would raise a reasonable probability that the convicted person's verdict or sentence would be more favorable in the results of DNA testing had been available at the time of the conviction.'
> (b) As asserted by the People, at trial there was presented an abundance of testimonial and physical evidence establishing [Petitioner]'s guilt.
> (c) The new evidence raised in the concurrent petition for writ of habeas corpus does not cast a serious doubt as to the reliability of [Petitioner]'s murder conviction."

(Ex. A, Order on Motion for Performance of DNA Testing.)

The Court finds that the state court's adjudication of the claim resulted in a decision that was based on a reasonable determination of the facts in light of the evidence presented in the State court proceeding.  See 28 U.S.C. § 2254(d)(2).  In Petitioner's case, the appellate court reviewed his claim after "considering (1) the papers filed in support of and in opposition to the motion, and (2) the oral argument of the counsel."  (Ex. A, Order on Motion for Performance of DNA Testing.)  The Court concludes that Petitioner had a full, fair and complete opportunity to present evidence in support of his claim to the state courts, of which he took full advantage.  Therefore, the Court finds that the appellate court's factfinding process was intrinsically reasonable.

Upon finding that the appellate court's factfinding process survives an intrinsic review, the Court now turns to the appellate court's determination of the facts which is "dressed in a presumption of correctness."  Taylor, 366 F.2d at 1000.  The appellate court's factual finding that "at trial there was presented an abundance of testimonial and physical evidence establishing [Petitioner]'s guilt," is presumed

1   correct under section 2254(e)(1) unless rebutted by clear and convincing evidence.  (Ex. A, Order on

2   Motion for Performance of DNA Testing at 1.)

3        In order to rebut the presumption, Petitioner argues that the new evidence casts a serious doubt on

4   the reliability of Petitioner's conviction and there is a reasonable probability that the DNA evidence would

5   have made a more favorable outcome.  To support this, Petitioner presents what he contends as "new

6   evidence."  First, he notes that Jerred Hernandez is wanted in Ukiah in connection with the murder of

7   Michael Williamson and, he alleges, may, in fact, be a serial killer.  Secondly, he submits a declaration from

8   Stuart L. Robinson, a friend of Petitioner, contending that Robinson believes Petitioner's wife knew that the

9   murder weapon had been placed under the trailer after Petitioner's arrest.  Robinson believes this because

10  Petitioner's wife "asked Kathleen Sharp to look under the trailer the day after she had asked Dave

11  Arreguin, her brother-in-law, to look under her trailer for fishing poles up by the beams and he did not see

12  any and thought he was being set up."

13        Thirdly, Petitioner submits the declaration of Doug Moody, who states that on the night of  Ms.

14  Lawson's murder he saw three vehicles, including one he thought to be Petitioner's at the location of the

15  murder.  He declares that he saw three young men, possibly more, who ducked down behind the vehicles

16  as he drove past with his daughter and several members of the South Fork High School girl's basketball

17  team, between 12:45 a.m. and 1:15 a.m., Sunday, September 19, 1999.  The only person he recognized

18  was Jerred Hernandez, who he knew from the Calico Café.  He did not see Petitioner, who he also knows.

19  Mr. Moody noted that he "did not want to get involved because [he] assumed that what [he] saw was not

20  very important and the truth would prevail."  After Petitioner's conviction, Mr. Moody "decided to come

21  forward because sentencing someone to life for a crime he might not have done seems unfair."  Finally,

22  Petitioner offers the declaration of Jeffrey D. Cyphers, lead defense investigator, who declared that he

23  spoke with Rudy Leon, Hernandez' roommate, who told him that Hernandez committed perjury when

24  testifying that he and his girlfriend, Brandi Golliher, spent the night together at Hernandez's apartment.

25  Leon told him that Hernandez and Ms. Golliher left the apartment around 1:00 a.m. on the morning of

26  September 19, 1999, and did not return, contrary to Hernandez's testimony.

27

28                                                                 17

1    Without more, the information presented by Petitioner does not rise to the level of clear and

2   convincing evidence sufficient to rebut the presumption of correctness.  Therefore, the Court concludes that

3   the appellate court's decision was not "objectively unreasonable."

4    Accordingly, Petitioner is not entitled to habeas relief on his claim that his Due Process rights were

5   violated by the state court's refusal to DNA test the two cigarette butts found at the scene of Ms. Lawson's

6   murder.

7    **e.    The Prosecutor's comment on Petitioner's post-arrest silence was, in fact, a**
    **Doyle violation.  However, the error did not so infect the trial as to make the**
8    **conviction a violation of Due Process.**

9    **i.    Background**

10    Petitioner alleges that the Prosecutor committed misconduct in violation of Doyle v. Ohio, 426 U.S.

11   610 (1976).  He argues that the Prosecutor's comment on his post-arrest silence, made during closing

12   argument, was used for the impermissible purpose of suggesting that he fabricated his story implicating

13   Hernandez in Ms. Lawson's murder.  Additionally, Petitioner argues that the lack of a curative instruction

14   by the trial court made the comment prejudicial and harmful beyond a reasonable doubt.

15    **ii.    Applicable Federal Law**

16    A defendant's due process rights are violated when a prosecutor's misconduct renders a trial

17   "fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); see Smith v. Phillips, 455 U.S.

18   209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is

19   the fairness of the trial, not the culpability of the prosecutor").  Claims of prosecutorial misconduct are

20   reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks

21   so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Johnson v.

22   Sublett, 63 F.3d 926, 929 (9th Cir.) (citation omitted, cert. denied, 516 U.S. 1017 (1995).  Under the

23   AEDPA, the state court's disposition will not be disturbed unless there has been an unreasonable

24   application of Supreme Court precedent, or that the state court's decision has unreasonably applied the

25   facts as presented at the state court trial.  Furman v. Wood, 190 F.3d 1002, 1006 (9th Cir. 1999.)

26    The first factor in determining the prejudicial effects of misconduct is whether the trial court issued a

27   curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded

28   inadmissible evidence and that no due process violation occurred.  See Greer v. Miller, 483 U.S. 756, 755

United States District Court
For the Northern District of California

18

n.8 (1987).  This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant.  See Greer, 483 U.S. at 766 n.8.

Other factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, compare United States v. Young, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) with United States v. Schuler, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, see Darden, 477 U.S. at 182.

"A court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation will draw that meaning from a plethora of less damaging interpretations." Williams v. Borg, 139 F.3d 737, 744 (9th Cir. 1998) (citing Donnelly v. DeChristoforo, 616, U.S. 637, 647 (1974)).  In determining whether a due process violation occurred, the arguments of counsel are generally accorded less weight by the jury than the court's instructions and must be judged in the context of the entire argument and the instructions.  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 898 (9th Cir. 1996).

### iii.    **Analysis**

Post-arrest silence after Miranda warnings cannot be commented upon or used by the prosecution. See Doyle v. Ohio, 426 U.S. 610, 611 (1976); see, e.g., Killian v. Poole, 282 F. 3d 1204, 1210-11 (9th Cir. 2002) (conviction reversed under Doyle because if a person is told she can exercise her right to be silent whenever she wants without penalty, she should not be badgered by a prosecutor eight times during cross-examination and closing argument about whether she has "something to hide" by exercising that right); United States v. Branson, 756 F.2d 752, 754 (9th Cir. 1985) (prosecutor's use of defendant's silence after Miranda warnings required reversal of guilty verdict where prosecutor tried to prove defendant "knowingly"

gave counterfeit bills by repeatedly bringing to the jury's attention the fact that defendant did not tell the Secret Service the source of funds). This reasoning extends to defendant's decision to retain counsel. See United States v. Kallin, 50 F.3d 689, 693-95 (9th Cir. 1995) (conviction reversed where prosecution made repeated references to defendant's decision to retain counsel and failure to come forward earlier with explanation of innocence).

Though courts in the past have applied the harmless error standard of Chapman v. California, 386 U.S. 18, 24 (1967), to constitutional violations in habeas corpus, see, e.g., Yates v. Evatt, 500 U.S. 391, 402-07 (1991), the United States Supreme Court has ruled that the Chapman standard is no longer applicable to federal habeas review of state criminal proceedings. See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993). In Brecht, the Court held that the appropriate standard on federal habeas corpus review of a state conviction for determining whether a constitutional error of the trial type is harmless is that of Kotteakos v. United States, 328 U.S. 750, 776 (1946): whether the error had a substantial and injurious effect or influence in determining the jury's verdict, rather than whether it was harmless beyond a reasonable doubt. See Brecht, 507 U.S. at 637. Under this standard, habeas petitioners may obtain plenary review of the constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in '"actual"' prejudice. See id. (citing United States v. Lane, 474 U.S. 438, 449 (1986)); Johnson v. Sublett, 63 F. 3d at 930 (finding prosecutorial vouching "could not have had substantial impact on the verdict necessary to establish reversible constitutional error" under Brecht). Further, because the standard is grounded in the federal harmless error rule (28 U.S.C. § 2111), federal courts may turn to an existing body of case law in applying it. See Brecht, 507 U.S. at 638. The Brecht standard applies in federal habeas corpus cases under § 2254. See Bains v. Cambra, 204 F.3d 964, 977 (9th Cir.), cert. denied, 531 U.S. 1037 (2000).

In Petitioner's case, at closing argument the Prosecutor commented:

> "The defendant then took the stand and told you that you have his word on it, but what it does prove is if, in fact, it happened, the fact is that he is a tattletale. So in situations where he has nothing to gain, he will tell on others; but when he is facing a murder charge and spending all these six months in jail, then he won't say anything. He has been willing to sit in jail and face being convicted for a murder he says someone else did, and this person is someone he knew for all of three months."

(Ex. B, RT 978.)

United States District Court

For the Northern District of California

1          As the California appellate court correctly concluded, the Prosecutor committed <u>Doyle</u> error.

2   However, Petitioner's counsel failed to object to the Prosecutor's comment and the trial court therefore

3   had no duty to offer a curative instruction.

4          A review of the trial record shows overwhelming evidence of Petitioner's guilt.

5          Petitioner admitted under oath to offering three versions of his story starting from the time he

6   voluntarily contacted the police on September 20, 1999.  (Ex. B, RT 881-83.)  Additionally, he voluntarily

7   told the police on September 20, 1999, that he might have been the last person to see Ms. Lawson. (Ex. B,

8   RT 881.)  Brandi Golliher spotted him alone in his truck with Ms. Lawson, a little before 1:00 a.m.,

9   September 19, 1999.  (Ex. B, RT 931.)  Jerry Kearney spotted Petitioner alone with Ms. Lawson thirty

10  minutes later, at 1:35 a.m., heading in the direction where Ms. Lawson's body was eventually found just

11  hours later.  (Ex. B, RT 599-602.)  Prior to September 19, 1999, Petitioner told Rudy Leon that he

12  intended to kill Ms. Lawson for the theft of drugs.  (Ex. B, RT 644, 647-48.)  On September 17, 1999,

13  Petitioner told Ms. Kent that he intended to shoot Ms. Lawson in the back of the head, under the chin, and

14  behind the ear, with a .22 caliber gun that he kept under his truck seat.  (Ex. B, RT 617-619.)  On

15  September 19, 1999, Petitioner admitted to Hernandez that he killed Ms. Lawson.  (Ex. B, RT 675.)

16  Further, a .22 caliber gun was found hidden on Petitioner's property, and that gun was determined to be

17  the murder weapon.  (Ex. B, RT 774-776, 831-34.)

18         When measuring the Prosecutor's single mention of Petitioner's post-arrest silence against the

19  overwhelming evidence of Petitioner's guilt presented in court, the Court finds no "actual prejudice" to

20  Petitioner based on the Prosecutor's <u>Doyle</u> violation.  Accordingly, the Court does not find that the error

21  had a substantial and injurious effect or influence in determining the jury's verdict.

22         Petitioner is not entitled to habeas relief on his claim that his Fourteenth Amendment right was

23  violated by the Prosecutor's comment on his post-Miranda silence.

24         **f.    Petitioner's claim of ineffective assistance of counsel fails with respect to his
              counsel's failure to request specific jury instructions and his failure to object**
25            **during trial to a Doyle violation.**

26              **i.    Background**

27         Petitioner argues that he was denied effective assistance of counsel because his trial counsel (1)

28  failed to request a jury instruction on Third-Party Culpability; (2) failed to request an Alibi jury instruction

under CALJIC 4.50; and (3) failed to request modifications to CALJIC Nos. 2.01 and 2.70, regarding the terms of guilt and "innocence"; and (4) failed to object to <u>Doyle</u> error allegedly committed by the Prosecutor during closing argument.

### ii.   **Applicable Federal Law**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  <u>Id</u>.  The right to effective assistance of counsel applies to performance of both retained and appointed counsel without distinction. <u>See</u> <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 344-45 (1980).

In order to prevail on an ineffective assistance of counsel claim, Petitioner must establish two elements.  First, counsel's performance was deficient, meaning, that it fell below an "objective standard of reasonableness" under prevailing professional norms.  <u>Strickland</u>, 466 U.S. at 687-88.  Second, Petitioner must establish that he was prejudiced by counsel's deficient performance, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id</u>. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Id</u>.

Under <u>Strickland</u>, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  <u>Id</u>. at 697.  Under the guidance of these legal standards, this Court turns directly to the second prong of the <u>Strickland's</u> test with respect to the four claims.

### iii.   **Analysis**

**1.   Petitioner's claim of ineffective assistance of counsel fails with respect to his third-party culpability claim.**

//

United States District Court

For the Northern District of California

1    Petitioner alleges that he presented a third-party culpability defense and that his trial counsel's

2  failure to request the appropriate third-party culpability instruction violated his Sixth and Fourteenth

3  Amendment rights.

4    Petitioner alleges that the prosecution case against him was largely based on the testimony of

5  unreliable witnesses, who had a motive to lie about Petitioner's alleged involvement, and others who had a

6  motive to help Hernandez.  Thus, trial counsel's failure to request proper instructions on third-party

7  culpability cannot be considered harmless error under any standard of review.

8  Petitioner provides a declaration from his trial counsel, in which counsel admits that he "had no tactical

9  reason for failing to request the instructions on third-party culpability."  (Ex. A, Declaration of Roger

10 Parshall, Points and Authorities in Support of Petition for Writ of Habeas Corpus.)

11    However, Petitioner has not shown that there was a reasonable probability that, but for counsel's

12 unprofessional errors, the result of the proceeding would have been different.  Rather, Petitioner simply

13 states "it is reasonably probable that defense counsel's failure to request proper instructions affected the

14 jury's verdict, because Petitioner's testimony provided the jury with a sufficient basis to find a reasonable

15 doubt if the court had properly instructed the jury with respect to Petitioner's defenses and highlighted the

16 fact that Petitioner's alleged confessions and admissions needed not only to be viewed with caution, but

17 needed corroboration."  (Petitioner's Traverse, 14:21-15:1.)

18    Third-party culpability was not available to Petitioner after the trial court ruled on the Prosecutor's

19 in limine motion.  Petitioner also failed to produce evidence sufficient to convince the trial court to review its

20 decision.

21    Petitioner has not demonstrated that the conviction resulted in a breakdown in the adversary

22 process rendering the result unreliable.  Accordingly, Petitioner has not shown prejudice under the

23 Strickland's standards.

### 2.    Petitioner's claim of ineffective assistance of counsel fails with respect to the alibi jury instruction claim.

25    Petitioner argues that he presented an alibi defense and that his trial counsel's failure to request the

26 appropriate alibi instruction constituted a violation of his Sixth and Fourteenth Amendment rights.

27    To support this allegation, Petitioner provides a declaration from his trial counsel, Roger Parshall,

28    who states:

23

United States District Court

For the Northern District of California

1

2

3

4

5

> "I had no tactical reasons for failing to request instructions on alibi . . . . [I]t did not occur to me that our defense was a combination of third-party culpability and alibi, so I did not think of asking for the CALJIC No. 4.50, the alibi instruction.  I did not do any legal research on this issue, but if I had realized that I could request an alibi instruction, and that my failure to do so might waive any appellate issue with regard to the giving of an alibi instruction, I would have requested it."

6  (Ex. A, Declaration of Roger Parshall, Points and Authorities in Support of Petition for Writ of Habeas Corpus.)

7  However, Petitioner has not shown that there was a reasonable probability that, but for counsel's

8  unprofessional errors, the result of the proceeding would have been different.  Petitioner has not

9  demonstrated that the conviction resulted in a breakdown in the adversary process rendering the result

10  unreliable.  Accordingly, Petitioner has not shown prejudice under the Strickland's standards.

11  Petitioner has failed to establish that he is entitled to habeas relief on the basis of this claim.

12  **3.**      **Petitioner's claim of ineffective assistance of counsel fails with respect to his claim that trial counsel did not offer pinpoint jury instructions in place of CALJIC Nos. 2.01 and 2.70.**

13

14  Petitioner contends that his Sixth and Fourteenth Amendment rights were violated when his trial

15  counsel, Roger Parshall, failed to ask for modifications to the provided jury instructions.  He claims that the

16  jury should have been alerted that his alleged admissions and confessions should have been corroborated,

17  and that they, the jury, decide not between guilt and innocence, but between guilt and not proven guilty

18  beyond a reasonable doubt.

19  To this end, Petitioner provides a declaration from his trial counsel stating that there was "no tactical

20  reason for failing to request modifications to the CALJIC Nos. 2.01 and 2.70 instructions.  I assumed that

21  the CALJIC pattern instructions were correct, so I did not do any legal research on these issues, but if I

22  had known that I could request such modifications . . . and that my failure to do so might waive any

23  appellate issue with regard to these modifications to these instructions, I would have requested them."  (Ex.

24  A, Declaration of Roger Parshall, Points and Authorities in Support of Petition for Writ of Habeas Corpus.)

25  Assuming, arguendo, that trial counsel's performance was deficient, Petitioner has not shown that

26  there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

27  would have been different.  Nor has Petitioner demonstrated that the conviction resulted in a breakdown in

28

the adversary process rendering the result unreliable.  Accordingly, Petitioner has not shown prejudice under the <u>Strickland's</u> standard.

Petitioner has failed to establish that he is entitled to habeas relief on the basis of this claim.

### 4. <u>Petitioner's claim of ineffective assistance of counsel fails with respect to his claim of Doyle error due to the overwhelming evidence of his guilt.</u>

Petitioner argues that his Sixth and Fourteenth Amendment rights were violated when trial counsel failed to object to a <u>Doyle</u> error committed by the Prosecutor during closing argument, if an admonition would have cured the harm.  Petitioner provides a declaration from trial counsel, which notes, "I had no tactical reason for failing to object to the prosecutor's closing argument when she referred to the petitioner remaining silent for six months . . ."  (Ex. A, Declaration of Roger Parshall, Points and Authorities in Support of Petition for Writ of Habeas Corpus.)

In light of the weight of evidence pointing to Petitioner's guilt, including his own admission that he may have been the last person to see Ms. Lawson; two eyewitness reports of him alone with Ms. Lawson in his truck in the early morning hours just before her death; his ownership of the murder weapon; his admission of guilt to Hernandez; and his claims to Ms. Kent and Rudy Leon that he wanted to kill Ms. Lawson over the theft of methamphetamine, Petitioner has not shown a reasonably probability, or a probability sufficient to undermine confidence in the outcome, the result of the proceeding would have been different but for counsel's performance.

Petitioner has failed to establish that he is entitled to habeas relief on the basis of this claim.

### CONCLUSION

The Court finds that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition for writ of habeas corpus is DENIED.

Date: November 14, 2005

JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Frances Marie Dogan Frances.Dogan@doj.ca.gov
Richard Jay Moller jaym@humboldt.net

**Dated: November 14, 2005**                    Richard W. Wieking, Clerk

                                               **By:   /s/ JW Chambers**
                                                       **Ronald L. Davis**
                                                       **Courtroom Deputy**

**United States District Court**
For the Northern District of California